UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DINA BARNETT,

    Plaintiff,

v.                                                Case No: 8:14-cv-343-T-36TBM

BAYCARE HEALTH SYSTEM, INC.,

    Defendant.
_____/

# **ORDER**

THIS MATTER comes before the Court upon the Defendant's Motion for Summary Judgment (Doc. 17), and Plaintiff's response thereto (Doc. 30). Upon due consideration of the parties' submissions, including deposition transcripts, affidavits, memoranda of counsel and accompanying exhibits, and for the reasons that follow, Defendant's Motion for Summary Judgment will be granted.

**I.**     **Undisputed Material Facts**[1]

Defendant BayCare Health System, Inc. ("BayCare") is a community-based health system in the Tampa Bay area that is composed of a network of ten not-for-profit hospitals, outpatient facilities, and services such as imaging, lab, behavioral health and home health care. Doc. 17-22 ¶ 3. Morton Plant Mease Healthcare ("Morton Plant") is part of the BayCare health system. *Id.* ¶ 4. Morton Plant's facilities include Morton Plant North Bay Hospital ("North Bay"), the location at which Plaintiff Dina Barnett ("Barnett") was employed during the relevant time. *Id.* BayCare employed Barnett in various capacities over several years. *Id.* ¶ 5.

---

[1] The Court has determined the facts based on the parties' submissions, including deposition transcripts, affidavits and accompanying exhibits.

At the time she began her employment and annually thereafter, Barnett attended an orientation and reviewed the various BayCare policies that related to her employment. Doc. 21 at 44:17-25[2]; Doc. 17-2. Baycare's punctuality and attendance policy stated that late arrival of more than six minutes after the employee's scheduled start time is considered tardy. *See* Doc 17-6 at p. 2 and 7. Five unexcused tardies within a 12-month period is considered excessive. Doc. 17-6 at p. 4 and 9. BayCare has a progressive discipline policy that provides four steps: (1) written counseling, (2) written warning, (3) final written warning, and (4) termination. Doc. 17-7 at p. 2. However, supervisors are not required to follow all steps in each situation and may jump to a higher level of discipline at their discretion. *Id.* at p. 3. Violation of the attendance and punctuality policy is listed as a reason for immediate termination. *Id.*

From 2006 until October 3, 2008, BayCare employed Barnett as a CNII in the Surgery Department. Doc. 21 at 17:14 – 18:1. Barnett received several disciplinary warnings regarding attendance issues and late arrivals in 2005, 2006 and 2008. Doc. 21 at 97:6 – 100:23; Doc. 17-18. Still, on October 4, 2008, BayCare promoted Barnett to CNIII, where she remained until March of 2012, when she voluntarily stepped down from her supervisory duties. Doc. 17-22 ¶ 5. When Barnett stepped down from her position as CNIII, she was reclassified as a CNII and lost the additional pay associated with the CNIII designation. *See* Doc. 17-22 ¶ 57.

As a CNIII (which for wage purposes is a higher job code than a CNII), Barnett worked in a supervisory capacity as a charge nurse, and had additional responsibilities that yielded a 5% increase in her pay. Doc. 17-22 ¶ 6; Doc. 21 at 18:8-9. Barnett's daily responsibilities as a CNIII

---

[2] The deposition transcripts were submitted in "mini-script" format. Therefore the citations to depositions in this order will refer to the transcript page numbers rather than the page of the court document. For example, mini-page numbers 5-8 are all printed on court document page 2. The record citation herein would cite to the mini-page 5, 6, 7 or 8, as well as the lines therein.

included running the charge nurse desk, overseeing the flow of the surgeries taking place in the various operating suites, assigning staff to work cases, ensuring that all equipment/supplies needed for surgery were there when needed, and holding morning meetings before surgery cases started in which various issues pertaining to surgery were discussed. Doc. 21 at 18:19 – 19:21, 25:3-18. Barnett was also required to plan for any "add-on" cases that would arise on the day of surgery, check in as cases were taking place and, if something was needed or missing from a surgical suite, make arrangements to quickly obtain the needed equipment/supplies. Doc. 21 at 21:13 – 24:23.

From January 9, 2008 to March 17, 2011, Barnett reported to Lauren Witmer ("Witmer"), who was the Nurse Manager for Surgical Services and Imaging at the time. Doc. 17-22 ¶ 7. From June 26, 2011 through the date of her termination, Barnett reported to Jennifer Downing ("Downing"), Nurse Manager for Surgical Services. Doc. 21 at 26:18 – 27:14. However, there was a window of time prior to BayCare hiring Downing that there was no nurse manager in the department. Doc. 23 at 10:23-24, Doc. 27 at 8:16-18. During that time, Shannon Hancock ("Hancock"), Director of Nursing ("DoN"), was responsible for oversight of the Surgery Department. Doc. 27 at 8. Hancock was the DoN at North Bay from 2006 until at least July 23, 2014. Doc. 22 at 4:10-20.

In May of 2010, Barnett's husband, Jerome Barnett ("Mr. Barnett") was diagnosed with liver cancer. Doc. 21 at 38:15-17, 96:19-23. Barnett made her first request for leave under the Family and Medical Leave Act ("FMLA" or "the Act"), to care for her husband, on or about July 26, 2010. Doc. 21 at 50:15-17. This request was for intermittent FMLA leave[3] and was ultimately

---

[3] (1) Intermittent leave may be taken for a serious health condition of a spouse, parent, son, or daughter, for the employee's own serious health condition, or a serious injury or illness of a covered servicemember which requires treatment by a health care provider periodically, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks. Examples of intermittent leave would include leave taken on an occasional basis for medical appointments, or leave taken several days at a time spread over a period of six months, such as for chemotherapy. A pregnant employee may take leave intermittently for prenatal examinations or for her own condition, such as for periods of severe morning

3

approved by BayCare. Doc. 21 at 51:7-13. Plaintiff's intermittent leave was scheduled to begin on August 27, 2010 and remain in effect until July 30, 2011, or until she had exhausted her annual FMLA leave entitlement – whichever came first. Doc. 21 at 51:20 – 52:2; Doc. 17-3 at pp. 1-3. At the time the leave was approved, Barnett was given written instructions regarding how to report her intermittent FMLA leave:

> You are responsible for notifying your supervisor in advance of each absence when you will not be able to work due to this qualifying condition. Team members are expected to communicate absences by telephone or other means with their supervisor and/or in the manner specified by the department or unit specifically noting that the time is for FMLA purposes.

Doc. 17-3 at p. 3. Downing noted that Barnett could designate her time out as FMLA related by telling the person she was calling into that it was FMLA –related, making a note on the exception sheet, or having a verbal discussion with the timekeeper. Doc. 23 at 26:4-9. Barnett recognized that she was responsible for letting her employer know whether her leave was FMLA-related:

> Q: What were your understanding of the duties that you had regarding reporting leave?
>
> A: That 1 needed to call and let them know when I called in the morning whether it was FMLA or not.

Doc. 21 at 89:1-4.

When Barnett was going to be late to work or absent, for any reason, she would call the department and either leave a message or speak to Virginia "Ginger" Cook. Doc. 21 at 32:19 –

---

sickness. An example of an employee taking leave on a reduced leave schedule is an employee who is recovering from a serious health condition and is not strong enough to work a full-time schedule.

(2) Intermittent or reduced schedule leave may be taken for absences where the employee or family member is incapacitated or unable to perform the essential functions of the position because of a chronic serious health condition or a serious injury or illness of a covered servicemember, even if he or she does not receive treatment by a health care provider. See §§ 825.113 and 825.127.

29 C.F.R. § 825.202 (2014).

33:7, 49:14-15. Cook would relay any messages from Barnett to the nurse manager or an acting charge-nurse and, if Barnett mentioned that the tardiness or absence was FMLA related, Cook would make a note of that on the schedule that hung behind the charge nurse desk. Doc. 27 at 6:12 – 7:5, 8:12 – 9:11, 12:11-21. If Barnett called in and said that she was late because she "had to set [her husband] up for the day" without mentioning FMLA, Cook would not mark anything down on the schedule – she would simply relay the message to the nurse manager or an acting charge nurse. Doc. 27 at 17:4-11. Cook was not Barnett's supervisor and was not responsible for payroll or employee timekeeping. Doc. 27 at 7:25 – 8:7, 10:16-19. Her title was "charging specialist and scheduler" and she was responsible for scheduling surgeries. Doc. 27 at 4:19 – 5:10.

Barnett had the opportunity to review her time cards at least every two weeks and correct any errors she saw, i.e. designate time-off as FMLA related. Doc. 22 at 17:12-21; Doc. 21 at 33:15 – 34:1.

> Q During this period of time, had you the same ability to review your time at the end of each pay period that you always had before that, right?
> A Yes.
> Q So you could see there whether it was covered by FMLA or not?
> A Yeah, if l looked at it.

Doc. 21 at 94:15-20.

Barnett also had the opportunity to note any corrections to her time records on an exception sheet. Doc. 27 at 21:15-24; Doc. 21 at 34:5-13, 49:5-8, 89:8-10. The exception sheet was hung up in the unit and all employees had access to it. Doc. 21 at 46:19 – 47:5. In fact, there was more than one occasion when Barnett noted that her time out should have been designated as FMLA-related by using the exception sheet. Doc. 21 at 48:10 – 49:4.

During Barnett's period of intermittent leave, she submitted a request for a block leave of absence to care for Mr. Barnett following a liver transplant. *See* Doc. 17-4, Doc. 21 at 52:3-24.

5

BayCare approved the leave request and provided Barnett with block leave for the period of September 27, 2010 to October 25, 2010. *See* Doc. 17-4.

In July of 2011, Barnett received a "written counseling" from Hancock. Doc. 17-11; Doc. 21 at 55:24 – 57:2. The counseling indicated that Barnett had violated professionalism rules by taking personal calls and text messages during work and by having family members visiting her at work frequently. Doc. 21 at 57:12-20. The counseling also indicated that Barnett needed to "consistently arrive to work in time for morning report and run the board." Doc. 21 at 59:18-24. Finally, the counseling form mentioned that Barnett needed to improve her coaching of team members and hold them accountable. Doc. 21 at 61:19 – 62:7. Barnett wrote comments on the form indicating that she would "inform [her] family members as to the importance of not calling, stopping by – will get here on time and improve my accountability skills." Doc. 17-11 at p. 2.

On October 5, 2011, Barnett received a "written warning" which indicated that, since Barnett's FMLA leave expired on July 27, 2011, she had five unexcused absences. Doc. 21 at 63:13 – 64:3. Barnett testified that this warning was fair and not discriminatory. Doc. 21 at 64:21-23.

On or about October 12, 2011, Barnett made another request for FMLA leave. Doc. 21 at 126:13 – 127:2. This request was approved and she was granted additional intermittent leave between November 2011 and November 2012. Doc. 21 at 127:6-10. Again, Barnett received the same instructions regarding reporting her leave to her supervisor. *See* Doc. 17-5 at p. 2-3.

On March 16, 2012, Barnett was given a "final written warning." Doc. 21 at 76:24 – 77:2. The warning noted that Barnett had been late to work "26 times since January." Doc. 17-13 at p. 1. This warning also noted several performance issues and indicated that Barnett would be given two weeks to improve her performance before a re-evaluation. Doc. 17-13 at p. 2. As a result of

the March 16th warning, Barnett decided to step down from the position of Charge Nurse. Doc. 21 at 82:21 – 83:16.

On March 31, 2012, Barnett wrote a follow-up letter regarding the final warning to Team Resources. Doc. 21 at 79:6-10; Doc. 17-14. Barnett's letter stated that a "great number" of her late arrivals were due to her taking care of her husband, and could be classified as FMLA leave. Doc. 17-14 at p. 1; Doc. 21 at 81:6-24. Plaintiff reviewed her tardies at the time this letter was written, but could not identify any particular tardies that were misclassified. Doc. 21 at 84:7-20; Doc. 30 at p. 9. In this letter, Barnett requested documentation to support the performance issues identified in her final warning, as she believed they were mostly based on speculation and opinion. *See* Doc. 17-14. The letter closed with a statement that Barnett was "very happy with her decision to step down from the charge nurse position." Doc. 17-14 at p. 2, Doc. 21 at 83:17-22. Barnett was advised of the appeal process by Deborah Pasqua. No formal action was taken in response to this letter because Barnett chose not to pursue the formal appeal process. Doc. 24 at 17:5 – 18:7, 20:12 – 23:12.

On October 5, 2012, Barnett's employment was involuntarily terminated. Doc. 21 at 92:22 – 93:1. The termination form notes that Barnett had 15 additional tardies after the final warning on March 16, 2012. Doc. 21 at 93:9-19; Doc. 17-16 at p. 1. Barnett claims that some of these late arrivals should have been FMLA covered as well, but she cannot specify which ones. Doc. 21 at 93:23 – 94:8. Barnett does not know who made the decision to terminate her employment. Doc. 21 at 104:16-18. BayCare employees testified that Downing made the decision to terminate Barnett's employment. Doc. 22 at 14:16-17.

According to Barnett, one of the reasons that she believes her termination was retaliation for taking FMLA leave is that when she was terminated, the first thing Hancock told her was that

7

it had "nothing to do with FMLA." Doc. 21 at 101:11-17. Barnett also testified that, at some point during her employment, Downing said something along the lines of "your husband should be well enough to do things without help." Doc. 21 at 107:15-19. Finally, Barnett claims that the charge nurse who replaced her was not required to come in until 7:15 a.m., even though the surgery times had not changed – suggesting that she was unfairly disciplined for not being at work by 6:30 each morning. Doc. 121 at 108:8 – 109:8.

## II.     Standard of Review

Summary judgment is appropriate only when the court is satisfied that "there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law" after reviewing the "pleadings, the discovery and disclosure materials on file, and any affidavits[.]" Fed. R. Civ. P. 56(c)(2). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003).

Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the outcome of the suit under governing law. *Id*. The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

"'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope

8

that something will turn up at trial . . . .'" *Hamm v. Johnson Bros.,* Case No. 6:06-cv-1348-Orl-28KRS, 2008 U.S. Dist. LEXIS 54624, 6-7 (M.D. Fla. July 17, 2008) (quoting *Sawyer v. Southwest Airlines Co.,* 243 F. Supp. 2d 1257, 1261 (D. Kan. 2003)). "The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment." *LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999).

**III.** **Discussion**

    **A.** **FMLA Claims**

The FMLA permits, *inter alia*, an eligible employee to take up to twelve weeks of unpaid leave from work in any twelve-month period "to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition." 29 U.S.C. §2612(a)(1).

> Employees who take leave to which they are entitled under the FMLA must be reinstated to the position they held before taking FMLA leave. 29 U.S.C. §2614(a). In addition, the FMLA prohibits employers from retaliating against employees who exercise or attempt to exercise their FMLA-created rights. 29 U.S.C. §2615(a). Violations of the FMLA subject an employer to liability for damages and equitable relief. 29 U.S.C. §2617(a)(1)(A) & (B).

*Hollinger v. Hartford Fire Ins. Group,* Case No. 6:11-cv-59-Orl-19TBS, 2012 U.S. Dist. LEXIS 190499, 6-7 (M.D. Fla. Dec. 10, 2012).

Two types of claims may be brought under the FMLA—interference claims, "in which an employee asserts that [her] employer denied or otherwise interfered with [her] substantive rights under the Act," and retaliation claims, "in which an employee asserts that [her] employer discriminated against [her] because [she] engaged in activity protected by the Act." *Strickland v. Water Works and Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). Here, Barnett asserts both types of claims.

### 1.     *FMLA Interference*

"Interference includes refusing to authorize FMLA leave, discouraging the use of FMLA leave, manipulation to avoid responsibilities under the FMLA, and changing the essential functions of the job in order to preclude the taking of leave." *Shelton v. Price Waterhouse Coopers, LLP,* 8:12-cv-02757-T-27TBM, 2014 WL 2581348, 2 (M.D. Fla. May 2, 2014) (citing 29 C.F.R. § 825.220(b)). "By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under no fault attendance policies." 29 C.F.R. § 825.220(c).

"To state a FMLA interference claim, a plaintiff must demonstrate that [she] was entitled, under the FMLA, to a benefit that [she] was denied." *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir. 2006). For purposes of an interference claim, "the employer's motives are irrelevant." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1293 (11th Cir. 2006). Here, Barnett argues that Defendant interfered with her FMLA rights by failing to provide FMLA leave and terminating her while being aware of her need for leave.

The parties do not dispute that Barnett is an "eligible employee" within the meaning of the FMLA or that her husband had a serious health condition. Furthermore, Barnett does not allege that she requested time off for FMLA covered reasons that she did not receive. Rather, she alleges that the time she took off for FMLA reasons was not properly designated by her employer and then used to justify termination of her employment. Barnett's interference claim turns on whether she provided sufficient notice to her employer that her tardies were for FMLA-related reasons.

Barnett claims that many of the tardies and absences cited in her disciplinary action forms and termination form should have been classified as FMLA leave. However, Barnett cannot specify which instances fall in this category and offers no proof of the reasons for any of the subject

tardies or absences. Barnett did not always inform Cook, or her supervisor, that her time away from work was FMLA related. Additionally, Barnett admits that she had several ways and opportunities to correct such misunderstandings but did not avail herself of any of those avenues.

> Q Were you checking at the end of each payroll period to see if it was covered or not?
> A I don't know if l looked at every single one of my pay stubs -- I mean, my time cards.
> Q You didn't always write it up on the log that was on the door, right?
> A No.

Doc. 21 at 95:12-18.

Barnett was responsible for informing her employer when her time away from work was FMLA-related and she did not live up to this responsibility.

Barnett further claims that she was not required to use "magic words" and specifically mention the FMLA when she called in to say she would be late. However, the law cited by Plaintiff in support of this argument, 29 C.F.R. § 825.301(b), applies to an employee's *need* for FMLA leave. For example, if an eligible employee says he has cancer and needs time off for treatment, an employer is required to offer FMLA paperwork even if the employee does not specifically reference the Act. However, once an employee has applied for leave and it has been granted, the employee is expected to specify each time an absence is related to his FMLA covered leave. *See, e.g.,* 29 C.F.R. § 825.303; *Shelton v. Price Waterhouse Coopers, LLP,* Case No. 8:12–cv–02757–T–27TBM, 2014 WL 2581350, 1 (M.D. Fla. May 22, 2014) ("*Shelton II*").[4] By calling in and stating that she had to "set Mr. Barnett up for the day," Barnett did not sufficiently apprise BayCare that her absences were FMLA-related, despite having multiple opportunities to do so.

---

[4] It is also noted that BayCare's procedures specifically required Barnett to state that she was using FMLA leave.

11

Furthermore, Barnett has admitted that 10-20% of her tardies and absences were not FMLA-related, making her termination justified even if the unidentified but "disputed" instances are disregarded. *See id.* at 2. Accordingly, BayCare is entitled to judgment in its favor on the FMLA interference claim.

### 2. *FMLA Retaliation*

To state a *prima facie* case for FMLA retaliation, a plaintiff must show that "(1) she engaged in statutorily protected conduct, (2) she suffered an adverse employment action, and (3) there is a causal connection between the protected conduct and the adverse employment action." *Word v. AT & T*, 576 Fed. App'x 908, 916 (11th Cir. 2014). Notably, in contrast to a claim for FMLA interference, a plaintiff asserting a claim of FMLA retaliation faces the increased burden of establishing that her employer's actions were motivated by an impermissible retaliatory or discriminatory animus. *See Diehl v. Bank of Am., N.A.*, 470 Fed. App'x 771, 776 (11th Cir. 2012). "After the plaintiff establishes a *prima facie* case, the employer must provide a legitimate, nondiscriminatory reason for the adverse action." *Word*, 576 Fed. App'x at 916 (citation omitted). If the employer does so, the burden then shifts back to the plaintiff to prove that the reason was merely pretext for retaliation. *See id.* at 917.

Here, the parties do not dispute that Barnett engaged in statutorily protected conduct when she requested and took FMLA leave or that she suffered an adverse employment action when she was terminated from her position. Her termination was so closely related in time to Barnett's protected FMLA activity that the causation element of her *prima facie* case can be considered established for purposes of this summary judgment motion. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010) ("temporal proximity alone is sufficient to establish an inference of retaliation" when that proximity is "very close."); *Farley v. Nationwide Mut. Ins. Co.*,

197 F.3d 1322, 1337 (11th Cir. 1999) (seven weeks sufficiently close to create causal nexus); *Orquiola v. Nat'l City Mortg. Co.*, 510 F. Supp. 2d 1134, 1155 (N.D. Ga. 2007) (two-month delay satisfies "very close" temporal proximity requirement). Thus, Barnett has presented sufficient evidence of a *prima facie* case of FMLA retaliation.

Here, Defendant has set forth a legitimate, nondiscriminatory reason for its adverse actions, *i.e.*, that Barnett failed to meet BayCare's performance expectations and had excessive unexcused tardies. Barnett has not rebutted this reason. Barnett has presented no evidence whatsoever to call into question BayCare's reasons for terminating her employment. Barnett admits that she was aware of BayCare's attendance and punctuality policies. She also admits that a number of her unexplained absences and tardies were not FMLA-related and, therefore, legitimately formed the basis for her discipline. Accordingly, BayCare is entitled to summary judgment on this claim as well.

### B. Disability Discrimination

Plaintiff also alleges that Defendant discriminated against her because of her association with a disabled person, in violation of the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA"). "[D]isability-discrimination claims under the FCRA are analyzed using the same framework as ADA claims." *Holly v. Clairson Indus., LLC,* 492 F.3d 1247, 1255 (11th Cir. 2007).

Because Barnett has not offered any direct evidence of discrimination, to succeed on this claim, Barnett must put forth a *prima facie* case by showing that (1) she was qualified for the job; (2) suffered an adverse employment action; (3) was known to have a relative with a disability; and (4) that the challenged decision occurred under circumstances raising a reasonable inference of

discrimination. *Rocky v. Columbia Lawnwood Regional Medical Center,* 54 F. Supp.2d 1159, 1166 (S.D. Fla. 1999).

BayCare argues that Barnett was not qualified for her position because she was unable to comply with the attendance and punctuality requirements. Defendant is correct that "if the nature of an employee's position requires her to regularly and reliably attend work, and she fails to meet that requirement, then she is not qualified for her job." *Rocky,* 54 F. Supp. 2d at1166. Furthermore, Barnett's FMLA protections are not applicable under the ADA. Indeed, the law is clear that a non-disabled employee who violates a neutral employer policy concerning attendance or tardiness may be dismissed even if the reason for the absence or tardiness is to care for the employee's disabled relative. *See Rocky,* 54 F. Supp. 2d at 1164-65 ("the associational provision of the ADA does not require employers to make any "reasonable accommodation" for the disabilities of relatives or associates of a nondisabled employee."); *Sanford v. Slade's Country Stores, LLC*, 709 F. Supp. 2d 1232, 1239-40 (M.D. Ala. 2010); *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1231 (11th Cir. 1999). Barnett has failed to show that she was qualified for her position under the ADA or FCRA and her claims for disability discrimination fail as well.

Accordingly, as no genuine issues of material fact exist, Defendant is entitled to judgment in its favor as a matter of law on all counts of the Complaint. Therefore, it is

**ORDERED AND ADJUDGED**:

1. Defendant's Motion for Summary Judgment (Doc. 17) is GRANTED.

2. The Clerk is directed to enter judgment in favor of Defendant on all counts, to terminate any pending motions or deadlines, and to close this case.

      **DONE AND ORDERED** in Tampa, Florida on April 16, 2015.

                                                               */s/ Charlene Edwards Honeywell*
                                                               Charlene Edwards Honeywell
                                                               United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any